**Sandy SNYDER, Administrator of the Estate of David Haas, Plaintiff,**

**and**

**Bill Brooke; Robert Sandoval; and Robert Williams, Plaintiffs–Appellants–Cross–Appellees,**

**v.**

**FREIGHT, CONSTRUCTION, GENER-AL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL NO. 287; Ed Quintal; Ed De Brock; George Netto; and Lee Scoggins, Defendants–Appel-lees–Cross–Appellants.**

Nos. 96–15267, 96–15274.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1998.

Decided April 21, 1999.

As Amended June 3, 1999.

Christopher W. Katzenbach, Katzenbach and Khtikian, San Francisco California, for the plaintiffs-appellants-cross-appellees.

Kenneth C. Absalom, Beeson, Tayer & Bodine, San Francisco, California, for the defendants-appellees-cross-appellants.

Before: REINHARDT, NOONAN, and THOMPSON, Circuit Judges.

REINHARDT, Circuit Judge:

This case arises out of a bitter internal dispute involving charges of misuse of union funds. The struggle, which occurred twelve years ago, also involved a fight for control of leadership of the local union. At one point, shortly preceding a local union election, the plaintiffs took their charges of financial misconduct to federal court but were quickly disciplined by the union for using union funds to do so. The plaintiffs then filed the present action in the district court under §§ 101(a)(2), (a)(4), and (a)(5) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 411(a)(2)-(5). They asserted a violation of their free speech rights, their rights to sue, and their right to a fair union hearing, and sought damages on account of the "unlawful" disciplinary action. The plaintiffs won a substantial judgment from a jury on all counts, but lost that victory when the district judge ordered a new trial. The plaintiffs had succeeded earlier in the proceeding, however, in establishing a violation of their procedural rights to a fair union trial under § 101(a)(5). Accordingly, as to that claim, the jury was required to determine only the amount of the damages and the district judge limited the new trial order on that count to damages only. The plaintiffs appeal the new trial order in its entirety, while the defendants cross-appeal the earlier ruling of liability on the procedural claim. We uphold plaintiffs' appeal and reinstate the jury verdict; we also reject the defendant's cross-appeal.

I.

Background

Prior to the 1988 union elections, plaintiffs Bill Brooke, Robert Sandoval and Robert Williams were members of the Executive Board of Teamsters Local 287. Brooke was also vice-president, Sandoval was president, and Williams was a Trustee. During 1988, the plaintiffs and Dave

Haas[1] came to believe that Mario Gullo, the local's chief executive officer, its secretary-treasurer, was mishandling several of his financial responsibilities. In particular, due to the apparent absence of records that reflected the actual receipt and expenditure of "supplemental dues," the plaintiffs were concerned about how Gullo was handling that segment of the union's funds. For other reasons, they were also concerned about his handling of the Sick & Death Benefit Fund. Supplemental dues are paid by certain union members in addition to the standard dues that all members pay. The Sick & Death Benefit Fund, financed through regular dues, provides benefits to a union member who becomes disabled, or to the family of a member who dies.

In 1987, the union increased the share of the monthly dues payments allocated to the Sick and Death Benefit Fund. In early 1988, Sandoval became concerned that despite this increase, there was no corresponding increase in the Fund's total value. The plaintiffs approached Gullo about the discrepancy between the increased allotment for the fund and the Fund's actual growth, but did not receive what they felt to be a satisfactory explanation. This, combined with their frustration over their inability to determine the status of the monies paid as "supplemental dues," caused the plaintiffs to look for help outside the Teamsters union.

After first seeking assistance from the Department of Labor, the plaintiffs sought the advice of a private attorney, Fernando Hernandez, in September 1988. Following an initial meeting with Hernandez, the plaintiffs brought a motion before the local union Executive Board to hire Hernandez to conduct an investigation into the supplemental dues and "other related matters."

The motion passed, and the plaintiffs signed a retainer agreement with Hernandez on behalf of the local union.

In November 1988, as a result of Gullo's continued refusal to provide information regarding financial matters to the Executive Board, Hernandez filed an action against him in United States District Court on behalf of the individual plaintiffs and the union. The complaint alleged that in September 1987 Sandoval had requested an accounting of funds in Gullo's possession and that the bylaws of Local 287 require the secretary-treasurer to provide such an accounting, but that Gullo had failed to furnish one. The complaint further alleged that Gullo had diverted union funds to his own personal use. The complaint requested, inter alia, a full accounting and damages equal to the amount of funds misappropriated by Gullo.[2]

Shortly after the action was filed, Sandoval found a check on his bulletin board made out to the Sick and Death Benefit Fund in the amount of $11,748.28. Sandoval asked Gullo about the check, and Gullo responded that he had just recently "found" the money in his safe. As Sandoval testified:

> "I says: Mario, what's this? . . . This check for the Sick and Death Benefit. Where did it come from? And he says: Oh, we found it in the safe. We found that money in the safe. . . . I told him: You mean—how convenient. After all this time you find the money in the safe? . . . He says: That's all I could tell you."

In December 1988, the union held its election for officers and business agents. Haas defeated Gullo in the campaign for the top post, secretary-treasurer, but Gullo's supporters were elected to a majority

---

1. Haas, another member of the Executive Board and a business agent, was a plaintiff in the original action, but has since died.

2. In addition to filing the action, Hernandez performed several other functions. Hernandez secured for the Executive Board a copy of the racial discrimination settlement agreement reached between Gullo (on behalf of Local 287) and Syble Coleman. Hernandez also wrote to Fleming Foods to advise it that it was illegal to allow campaigning at the company by the Gullo slate and not by other candidates.

of the positions on the Executive Board. Sandoval was re-elected as president, while Brooke and Williams won positions as business agents.

The new Executive Board discharged attorney Hernandez. Gullo then filed internal union charges against the plaintiffs and Haas relating to the hiring of Hernandez and the institution of the action. The charges asserted that the plaintiffs' actions were "politically motivated and intended to harm [Gullo] and defraud the local union funds or credit in the amount of $13,-000...." A hearing on the charges was scheduled for August 16, 1989, but on August 15 the meeting was cancelled by Haas, pursuant to his authority as secretary-treasurer. As a result, none of the plaintiffs attended the hearing. A panel of the local union, consisting of the Gullo supporters on the Executive Board and three others chosen by them, held a hearing at the time scheduled, and tried and convicted the plaintiffs in absentia. Each plaintiff was removed from office, fined $5,000, and ordered to reimburse the union for costs incurred by attorney Hernandez. The plaintiffs appealed their convictions to Teamsters Joint Council 7, which subsequently reversed Haas's conviction, but affirmed the convictions of all plaintiffs here, although it reduced the fines to $500 each.[3]

On August 22, 1989, the plaintiffs filed a complaint in the United States District Court alleging that the assessment of fines against them and their removal from office constituted discipline in violation of the Labor Management Reporting and Disclosure Act. The complaint further alleged that the discipline was invalid because it was imposed in retaliation for plaintiffs' filing a legitimate lawsuit, in violation of § 101(a)(2) and (4) of the LMRDA, and that the hearings violated the plaintiff's right to due process in union disciplinary proceedings, in violation of § 101(a)(5).[4] In 1993, the plaintiffs and defendants filed summary judgment motions. The district court (Aguilar, D.J.) granted the plaintiffs' motion as to liability on the 101(a)(5) claim, holding that the original local union hearing denied the plaintiffs the process they were due under the Act, and that the Joint Council proceedings failed to cure these procedural defects. The court found that the first trial was "clearly biased given that plaintiffs' political opponents actively participated," *Haas v. Local 287*, 832 F.Supp. 283, 287, (N.D.Cal.1993), and that the second trial before the Joint Council was "biased as a matter of law" due to the Council's reliance on the records of the original proceeding. *Id.* The court denied all other summary judgment motions, and the case, including damages on the § 101(a)(5) claim, went to trial on August 16, 1994 before District Judge Ingram.

■ From the outset, the district court and both parties have characterized this action as a "mixed motives case." Accordingly, the district judge instructed the jury on how to assess liability in a mixed-motives case under the LMRDA. The jury returned a verdict in the plaintiffs' favor, and awarded compensatory and punitive damages.[5] Following the jury's verdict,

---

3. Contemporaneously, Gullo filed similar charges with the Teamsters Joint Council seeking to overturn the 1988 election. A re-run election was ordered by the Council and held in September 1989. This time, all the plaintiffs were defeated and Gullo once again became secretary-treasurer of the local union.

4. Section 101(a)(2) of the LMRDA protects union members' right to free speech in internal union matters; 101(a)(4) protects union members' right to sue their union or its officers; 101(a)(5) provides that no union member may be subject to internal union discipline without certain procedural safeguards. *See* 29 U.S.C. § 411(a)(2)-(5).

5. The jury awarded the following damages:

For plaintiff Brooke, the jury awarded $126,420 in lost wages, $14,450 for emotional distress, and $57,795 for injury to reputation on the §§ 101(a)(2) and (a)(4) claims, and $250,000 on the (a)(5) violation, as well as $50,000 in punitive damages against the union, $4,000 in punitive damages against defendant Quintal, $3,000 in punitive damages against defendant Netto, $2,500 against Scoggins, and $3,000 against DeBrock.

however, the court granted the defendants' motion for a new trial as to plaintiffs Brooke, Sandoval, and Williams.[6] The court ordered the new trial on the § 101(a)(2) and (a)(4) claims based on its understanding that the defendants' liability was to be assessed according to a mixed-motives regime, and that they had satisfied an affirmative defense available in mixed-motives cases.[7] In addition, the court ordered a new trial on damages on the plaintiffs' § 101(a)(5) claim, as to which liability had previously been established.

The second trial began on October 26, 1995. Again, it involved the plaintiffs' claims as to both liability and damages under §§ 101(a)(2) and (a)(4), and as to damages under (a)(5). The court again presented the jury with an LMRDA mixed-motives instruction identical in all relevant respects to that given during the first trial. This time, the jury returned a verdict for the defendants on the free speech and right to sue claims. As to the damages for the procedural due process violation, the jury awarded $5 to each plaintiff.

The plaintiffs appeal the district court's grant of a new trial following the original jury verdict, and the defendants cross-appeal the district court's grant of summary judgment on the plaintiffs' due process claim.

For plaintiff Sandoval, the jury awarded $136,500 for lost wages, and $58,500 for injury to reputation on the §§ 101(a)(2) and (a)(4) claims, and $250,000 on the (a)(5) violation, as well as $50,000 in punitive damages against the union, $4,000 in punitive damages against defendant Quintal, $4,000 against Netto, $2,500 against Scoggins and $3,500 against DeBrock.

For plaintiff Williams, the jury awarded $5,600 for lost wages, and $22,400 for injury to reputation on the §§ 101(a)(2) and (a)(4) claims, and $250,000 on the (a)(5) violation, as well as $50,000 in punitive damages against the union, $4,000 in punitive damages against defendant Quintal, $3,000 against Netto, $2,500 against Scoggins, and $3,000 against DeBrock.

## II.

### The Appeal

From the outset, both the parties and the district court have confused the issue by characterizing this litigation as presenting a "mixed motives" case. Indeed, the jury instructions were fashioned according to a mixed-motives liability regime. Most important for our purposes here, the district court's order setting aside the plaintiffs' verdict and directing a new trial was based on its understanding that the union had made out an affirmative defense available under a mixed-motives approach. As the district court wrote:

In this Court's view, the great weight of the evidence favors Defendants' affirmative defense that those plaintiffs would have been disciplined in any event for violating a reasonable rule of the Union even if the Defendants' disciplined them because of a retaliatory motivation.

The court derived this affirmative defense from *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the seminal Supreme Court case on mixed-motives liability. *Mt. Healthy*, and other true mixed-motives cases, however, involve the motives of the defendant. That is, a mixed-motives case calls on the court to determine what motive or motives led the defendant to take a disputed disciplinary action. When a defendant's motives are in

For Haas, the jury awarded $137,917 for lost wages, and $64,000 for injury to reputation on the §§ 101(a)(2) and (a)(4) claims, and $250,000 on the (a)(5) violation, as well as $50,000 in punitive damages against the union, $4,000 in punitive damages against Quintal, $3,500 against Netto, $3,000 against Scoggins, and $3,500 against DeBrock.

**6.** Because Haas had not signed the contract with Hernandez, the District Court ordered only a remittitur in his case.

**7.** The court also ordered a new trial for the award of damages on the § 101(a)(5) violation, although it did not explain in its new trial order why the § 101(a)(5) damages awarded by the first jury were excessive or otherwise inappropriate.

dispute, a court resolves the case by determining whether the defendant "has shown by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. If a defendant makes this showing, in a case where its motives are the issue, it satisfies an affirmative defense and is entitled to judgment.

This case, however, does not present a dispute as to what motivated the defendants to discipline the plaintiffs. All parties agree that the defendants disciplined the plaintiffs because the plaintiffs caused the Executive Board to retain Fernando Hernandez, to institute the action against Mario Gullo, the union's secretary-treasurer, and to obligate union funds in the process.[8] If that conduct is protected by the LMRDA, as the plaintiffs urge, the defendants' motives are irrelevant, at least as to liability.[9] The dispositive point in this case is that the conduct for which the plaintiffs were disciplined *was* lawful and may *not* constitute the basis for discipline under the LMRDA. The court, therefore, is not called on, as it is in a mixed-motives case, to determine what motivated the defendants to act. Although the confusion is understandable, and to a large degree was invited by the parties, the district court's new trial order was based on an erroneous legal theory.

The question presented by this case, in contrast to the question raised in a mixed motives case, is whether there was a legitimate basis for the *plaintiffs'* actions: that is, whether there was legitimate reason for the three plaintiffs, members of the union's Executive Board, to cause the union to hire Hernandez and to have him file the action against Gullo on the union's behalf, with the concomitant expenditure of union funds. Stated plainly, if the plaintiffs had legitimate grounds to cause the hiring of Hernandez and the institution of the action, then their conduct is protected and the discipline imposed on them was improper. If, on the other hand, the plaintiffs had no legitimate basis for their actions, the discipline imposed on them may have been lawful. This is because, unlike in the ordinary § 101(a)(4) case, the union is not purporting to discipline the plaintiffs simply because they, in their capacity as members, caused an action to be filed against the union or its officers—conduct that in itself is wholly immune from discipline under the LMRDA—but because as executive board members they caused union funds to be used for that purpose. The issue in the case before us, therefore, is whether the use of such funds was proper and lawful.[10]

To determine whether the plaintiffs had a legitimate basis to cause the union to retain the attorney and file the action we turn first to the LMRDA.[11] Sec-

---

**8.** That Hernandez performed several other tasks at the Board's request, such as procuring a copy of the Syble Coleman racial-discrimination settlement and informing Fleming Foods about the requirements of federal labor law, in no way alters our analysis.

**9.** As we explain later, in this case the plaintiffs' motives, as well as the defendants', are irrelevant.

**10.** Because, as we explain below, we conclude that there was a legitimate basis for the action against Gullo, we need not consider whether the plaintiffs could have been disciplined had they acted in good faith, but in fact no legitimate basis in fact existed for their actions. It would be odd, however, were the LMRDA to permit the discipline of any per-

sons seeking to recover union funds that they in good faith believed to have been improperly converted by a union official.

**11.** Because the defendants have not questioned the plaintiffs' ability to bring this action under § 101(a)(2) and (4), we do not address that question here. We note, however, that union officers, like union members are protected by the LMRDA against discipline that affects their rights as union members. *See, e.g. Grand Lodge of the Int'l Ass'n of Machinists v. King,* 335 F.2d 340, 343–44 (9th Cir.1964). The Supreme Court has held specifically that a "fine" is a "punitive action taken against union members as members." *Finnegan v. Leu,* 456 U.S. 431, 437–38, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). As the plaintiffs here were fined by the union, they

tion 501(a) of the LMRDA describes the "fiduciary responsibility of officers of labor organizations." Union officials such as Secretary–Treasurer Gullo "occupy positions of trust," and must "hold [the union's] money or property solely for the benefit of the organization and its members." 29 U.S.C. § 501(a). Equally important, § 501(b) dictates that:

> When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States....

29 U.S.C. § 501(b). Implicit in the grant to union members of the right to sue when the governing board of the union fails to do so, is an obligation on the part of the executive board of a union to bring an action (or seek appropriate relief in some other manner) on behalf of the union against an officer when the board becomes aware that the officer has violated his § 501(a) duties. Of course, in bringing such an action, the board may use union funds. Accordingly, if, at the time they acted, the plaintiffs, as executive board members, had valid cause to believe that Gullo was violating his § 501(a) fiduciary duties, then they had the right, if not the duty, under § 501(b) to act as they did, and the discipline imposed upon them was unlawful.

The evidence makes clear that the plaintiffs had valid cause to believe that Gullo was mishandling union funds. As stated above, the record demonstrates that during 1988, the plaintiffs came to believe that Gullo was mishandling several sources of union income. In particular,

the plaintiffs had reason for concern about how Gullo was handling supplemental dues and the Sick & Death Benefit Fund. There appeared to be no records regarding the former, and as to the latter, the records suggested serious delinquencies. Perhaps most relevantly, in 1987 the union increased the monthly payments made by each member to the Sick and Death Benefit Fund, and in early 1988 plaintiff Sandoval became aware that despite this increase, there was no corresponding increase in the Fund's total value.

As a result of Gullo's repeated refusals to provide information regarding these financial matters to the Executive Board, the plaintiffs caused the action to be filed against him, alleging that he had used union funds for his own personal use. Shortly after the action was filed, moreover, plaintiff Sandoval found the check on his bulletin board made out to the Sick and Death Benefit Fund in the amount of $11,748.28. When questioned, Gullo said that he had belatedly found the money in his safe.

In short, the evidence strongly supports the determination that at the time the plaintiffs hired Hernandez and caused the action to be brought against Gullo there was valid cause to believe that Gullo was mishandling the union's funds. That is to say, at the time the plaintiffs acted, they had valid cause to believe that Gullo was violating his § 501(a) duty to hold the union's money "solely for the benefit of the organization." Under § 501(b), therefore, the plaintiffs' actions were both appropriate and consistent with their legal obligations, and a jury finding to that effect would not have been subject to reversal by the district court.

Our conclusion that the plaintiffs' use of union funds to retain Hernandez and institute the action against Gullo was proper is further confirmed by Local 287's own Bylaws. The Bylaws allow the Executive Board to "[p]rovide for the employment

are protected against improper discipline by the LMRDA. *See id.*

and payment of attorneys," and "[o]n behalf of the Union, its officers, employees or members, to initiate, defend, compromise, settle, arbitrate or release or to pay the costs of any legal proceedings or actions of any nature if, in its judgment, it shall be necessary or desirable *to protect, preserve, or advance the interests of the organization.*" Bylaws, Art. XVII, §§ 1(c) and (d). Under the bylaws, therefore, the relevant question is whether the hiring of Hernandez and the filing of the action served to "protect, preserve, or advance the interests" of the Union.

The defendants are no doubt correct that an unmeritorious action filed solely to further the political interests of the union officials who cause its filing is not in the interests of the union. On the other hand, an action instituted to ensure that the union's secretary-treasurer is properly handling union funds is quite obviously one designed "to protect ... the interests" of the union. Section 501 of the LMRDA, which requires all union officials to "hold [the union's] money or property solely for the benefit of the organization and its members," itself makes this clear. As we concluded above, the record demonstrates that there was a reasonable basis for the action against Gullo. The plaintiffs' actions, therefore, were appropriate under, if not mandated by, § 501(b) and were in the interests of the union.

 It is irrelevant that the plaintiffs referred to the lawsuit against Gullo in the subsequent union election campaign or that they may have benefitted politically from it. It is also irrelevant that the plaintiffs may have been motivated, in whole or in part, by political considerations when they brought the action. When an action is brought to recover unlawfully expended union funds or to obtain a statuto-rily required accounting, a reasonable basis for the action is sufficient, under the LMRDA, to preclude discipline.

 While the district court based its jury instructions, at least in part, on the erroneous mixed-motives theory, it is clear that the jury was presented with and resolved the question that properly controls the outcome of this case: whether the plaintiffs had valid reason to cause the hiring of Hernandez and the institution of the action against Gullo.[12] The district judge first instructed the jury that if the plaintiffs sued Gullo "to safeguard the union's assets and property," then the plaintiffs' actions were protected. The judge then instructed the jury that "if you find by a preponderance of the evidence that there was a reasonable standard for the discipline of plaintiffs under the circumstances of this case, your verdict must be for defendants." The judge instructed that the plaintiffs could legitimately be disciplined if they violated the union rule "which restricts candidates for office from using Union funds ... in support of their candidacy." That is, under the instructions actually given by the district court, in order to find for the plaintiffs the jury was required to determine that they were engaged in protected conduct, i.e., that they hired Hernandez and instituted the action against Gullo in order to safeguard union assets. On the other hand, the jury was to find for the defendants if it determined that the plaintiffs used union funds to hire Hernandez and pursue the action "in support of their candidacy" for union office. While the plaintiffs might indeed have been entitled to an even more favorable instruction than was given (i.e. that regardless of the plaintiff's actual motives, a verdict should be returned in their favor if

---

**12.** An error in civil jury instructions does not require reversal if the error was more probably than not harmless. *See, e.g., Mockler v. Multnomah Cty.,* 140 F.3d 808, 812 (9th Cir. 1998). In *Westinghouse Elec. Corp. v. General Circuit Breaker & Supply, Inc.,* 106 F.3d 894, 902 (9th Cir.1997), we explained that an in-structional error is harmless where the verdict demonstrates that, despite the error, the jury necessarily found all elements legally necessary to support the verdict. *See also Benigni v. City of Hemet,* 879 F.2d 473, 480 (9th Cir.1988).

they had a legitimate basis for their actions, or ironically, if *their* motives were mixed) that error does not help the defendants.[13] In returning a verdict in favor of the plaintiffs, the jury necessarily concluded that the hiring of Hernandez and the institution of the action were undertaken in the interests of the union and not "in support of [the plaintiffs'] candidacy" for union office.

Under the instructions given, the jury's verdict reflects the critical determination that the plaintiffs' hiring of Hernandez and institution of the action against Gullo was undertaken in order to safeguard union assets. This is an appropriate determination under the proper theory of the case. The plaintiffs are entitled, therefore, to reinstatement of the original jury verdict.[14]

 The defendants also contend that the damages are excessive and warrant a new trial, and raise two specific issues in this regard: (1) an alleged error in the calculation of Sandoval's lost wages, and (2) excessiveness of the damages for the § 101(a)(5) (the procedural rights) violation. Because of the long and tortured history of both the factual and legal events in this internal union dispute, and the fact that this action for damages was filed a decade ago, we will be more specific with respect to our directions regarding damages than we might otherwise be. We first conclude that while a remittitur may be appropriate, no new trial is necessary. Where an award of damages is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork," *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir.1986), and gives rise to an inference that "passion and prejudice" tainted the jury's finding of liability, a new trial may be in order. *See, e.g. Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir.1987). As we have made clear, however, "[w]here there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict." *Seymour*, 809 F.2d at 1387. While there is some evidence that the jury miscalculated the stipend to which Sandoval was entitled, and while the defendants' arguments regarding the excessiveness of damages as to the due process claim may have some colorable merit, there is no evidence that the liability determination was in any way tainted by passion or prejudice. On remand, therefore, the district court may consider a remittitur of damages, but may not order a new trial.

In remitting damages, the court may adhere to the format it applied with respect to Haas, but not necessarily the monetary diminutions at which it arrived. In Haas's case, the court remitted the § 101(a)(5) damages to $1000, the punitive damages against the union to $25,000, and the punitive damages against the individual defendants to $500 per defendant. The court left unaffected the damages for lost wages and injury to reputation. Although the remittitur awarded with respect to Haas may have been appropriate in light of the assumptions on which it was based, we would point out that those assumptions are no longer valid. The district court assumed, for example, that there was no merit to Haas's underlying claims of unlawful discipline. It also assumed that Haas was less culpable than the other plaintiffs because he had not signed the employment contract with Hernandez. On remand, the district court must consider any remittitur in light of our holding that

**13.** As we note above, the district court also instructed the jury that it had to find for the defendants if the *defendants* satisfied the "mixed-motives" affirmative defense. While the court relied on an erroneous legal theory in giving this instruction, the availability of such a defense, of course, could only have helped the defendants. The presence of this erroneous instruction does not, therefore, alter our conclusion that the verdict for the plaintiffs should be reinstated.

**14.** Accordingly, we need not reach the appellants' claims regarding the second trial.

the plaintiffs' underlying claims of wrongful discipline were valid, and that indeed they were all disciplined unlawfully. Our holding also, of course, serves to eliminate any consideration of disparate culpability. Thus, the district court should treat the remittitur in Haas's case as a floor not a ceiling. Indeed, it would be well within its discretion to permit the plaintiffs to receive substantially higher damages than those allowed to stand in Haas's case.

We add a few caveats. Because defendants have preserved the claim of error on appeal, the district court may consider any contention regarding the amount of Sandoval's lost wages and reduce the award in his case to account for any erroneous calculation in that regard. As to punitive damages, the defendants did not specifically object to that part of the damages award on appeal, although they alluded to the subject in the heading of a sub-section of their brief. Given all the circumstances, we conclude that the district court retains its jurisdiction to issue an appropriate remittitur with respect to punitive damages in the case of the individual defendants, but that with respect to the union it should exercise that discretion only if it is strongly persuaded that such action is required in the interests of justice. In accordance with our holding, the district court may also remit a reasonable portion of the § 101(a)(5) damages award should it deem such a remittitur appropriate, but it may not remit any part of the damages award for lost wages (other than as a result of any erroneous calculation affecting Sandoval) or for injury to reputation. Because the Haas damages verdict did not contain any emotional distress award and thus the district court was not called on to consider its appropriateness, we leave to the district judge's discretion the question whether the award to Brooke of such damages is subject to remittitur, although we note that defendants did not consider that part of the award so excessive as to be worthy of mention in its brief. Interest on the damages ultimately awarded by the district court shall be paid from the date of the original judgment, October 18, 1994. *See, e.g., American Telephone & Telegraph Co. v. United Computer Systems, Inc.*, 98 F.3d 1206, 1209 (9th Cir.1996) (*citing Northrop Corp. v. Triad Intern. Marketing, S.A.*, 842 F.2d 1154, 1156 (9th Cir.1988)). That judgment was legally sufficient to allow adequate "ascertainment of the damage[s]," subject, of course, to the remittitur ordered herein. *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990).

### III.

#### The Cross Appeal

 We finally consider the defendants' argument that the district court erred in granting summary judgment on the plaintiffs' § 101(a)(5) due process claim. The defendants do not dispute the district court's finding that the first hearing, the hearing before the Local 287 board, was "clearly biased given that plaintiffs' political opponents actively participated." *Hass v. Local 287*, 832 F.Supp. 283, 287 (N.D.Cal.1993). Rather, they dispute the district court's holding that the second hearing, before the Teamsters Joint Council, was biased as a matter of law and that it therefore did not cure the procedural deficiencies of the first hearing.

 A trial de novo is required to remedy a union disciplinary hearing that does not meet the due process standards of § 101(a)(5). *See Myers v. Affiliated Property Craftsmen*, 667 F.2d 817, 820 (9th Cir.1982). Although a full trial de novo that results in an independent determination of the merits of the case can cure the procedural defects of a biased local union hearing, *see, e.g., Perry v. Milk Drivers' & Dairy Employees' Union, Local 302*, 656 F.2d 536, 539 (9th Cir.1981), a mere review of the evidence or results of the previous hearing, is not sufficient to constitute such a trial. Here, the evidence presented to the Joint Council consisted

almost entirely of the transcript of the first hearing (conducted before the biased Local 287 panel). A lengthy statement made at that hearing by Mario Gullo was introduced, but that hardly serves to cure the defects of the first trial. The plaintiffs did not testify themselves, nor did they put on witnesses, and while the Joint Council did formally give the plaintiffs an opportunity to present evidence, it is clear from the record that the plaintiffs were not afforded adequate notice of that opportunity.[15] In short, the Joint Council appears to have relied primarily on the transcript of the local union hearing, and accordingly the second hearing did not constitute a trial de novo. Under these circumstances, the second proceeding fails to cure the procedural defects committed at the first.[16] We therefore affirm the district court's grant of summary judgment as to plaintiffs' § 101(a)(5) claim.[17]

## IV.

### Conclusion

The district court's new trial order entered following the first trial is **RE-VERSED**. We **REMAND** to the district court for vacatur of the judgment following the jury's verdict in the second trial, for reinstatement of the jury's verdict in the first trial and entry of judgment in favor of the plaintiffs, and for consideration of a possible remittitur of damages. The district court's grant of summary judgment on the § 101(a)(5) claim is **AFFIRMED**.

**REVERSED AND REMANDED IN PART, AFFIRMED IN PART.**

---

**15.** Because of the lack of notice, the formal opportunity to testify afforded the plaintiffs does not render the Joint Council hearing a trial de novo. We do not, therefore, determine whether the Joint Council proceedings would have cured the procedural defects in the first hearing had the plaintiffs genuinely been afforded a full opportunity to testify.

**16.** The defendants argue that the Declaration of Chuck Mack demonstrates that the Joint Council "conducted a full retrial of the charges ...; that the charged parties presented witnesses, and had an opportunity to cross-examine the charging parties' witnesses; that documentary evidence was presented; and that the Joint Council's decision was based upon its own consideration of the evidence presented." This contention is misleading at best. The portion of Chuck Mack's declaration, to which the defendants refer, deals with the second hearing of David Haas. The plaintiffs had a *separate* second hearing before the Joint Council. Mack's declaration makes this perfectly clear, and the transcripts of the two separate proceedings are contained in the record. Although Mack's declaration regarding the Haas hearings does state that "[t]he Joint Council conducted a full retrial of the charges made against Mr. Haas," such a statement is conspicuously absent from Mack's declaration regarding the plaintiffs' second hearing. Mack's declaration with regard to *plaintiffs'* second hearing also does *not* indicate that the "charged parties present-

ed witnesses." It lends no support to the defendants' claim.

**17.** We note that our decision finds support in the holdings of other circuits. In *Catlett v. Local 7370,* 69 F.3d 254 (8th Cir.1995), for example, after the plaintiffs were disciplined by their local union, they appealed to the union International. The Eighth Circuit reiterated the rule that only a genuine trial de novo can cure procedural defects that occur at a union disciplinary hearing. *See id.* at 259. The court then held that because the International hearing panel relied on evidence presented at the earlier hearing, and because no oral testimony was taken at the hearing conducted by the union International, the second procedure did not constitute a trial de novo sufficient to cure the § 101(a)(5) defects of the first hearing. *See id.*

Likewise, in *Goodman v. Laborers' International Union,* 742 F.2d 780, 785 (3rd Cir.1984), the Third Circuit held that a second union disciplinary hearing did not constitute a trial de novo. The court concluded that incorporation of the record of the local union hearing into the evidence considered by the second panel was "improper" and undermined the "independence and objectivity" of the second hearing. *See id.* at 785. Despite the fact that the panel in the second hearing permitted the disciplined union member to put on a defense, the court found that the second proceeding could not cure any defects in the original local union hearing. *See id.*